JAMES H. AND JOANNE M. HARKEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Harken v. Commissioner
Docket No. 31229-83.
United States Tax Court
T.C. Memo 1985-468; 1985 Tax Ct. Memo LEXIS 161; 50 T.C.M. (CCH) 994; T.C.M. (RIA) 85468; September 9, 1985. Gary C. Randall, for the petitioners. Wayne R. Appleman, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent *162 determined the following deficiencies in petitioners' Federal income taxes: Year
Deficiency
1978
$11,085.24
1979
$ 1,853.00
1980
$ 5,935.00
After concessions, the issue for decision is whether petitioners are entitled to deductions for the years 1978, 1979, and 1980 under section 170(a)[1] in excess of the amounts allowed by respondent for contributions made by petitioners in 1978 and 1979 of certain paintings and sketches to the Museum of Native American Cultures in Spokane, Washington. [2]
FINDINGS OF FACT At the time they filed their petition in this case, petitioners, husband and wife, resided in Spokane, Washington. They filed joint Federal income tax returns for the years at issue with the Internal Revenue Service Center, Ogden, Utah. Petitioner James *163 H. Harken (Harken) worked as a dentist during the years at issue. His wife, petitioner Joanne M. Harken (Mrs. Harken), worked during those years as a hygienist in Harken's dental office. 1. Petitioners' Art Gallery Activities
Harken has been an art collector since 1969. In June 1977, he opened an art gallery, the J. Harken-Myers Gallery of Fine Arts (the gallery), at 510 West Sprague in downtown Spokane Washington. Dick Myers (Myers), whose name appears with Harken's in the gallery name, served as gallery manager, but had no ownership interest in the gallery. Prior to his employment at the gallery, Myers owned Treasure Trails Supply, where he sold geiger counter equipment, and, to a limited extent, displayed Western art for sale. Myers' employment at the gallery was terminated in late 1979, and Harken renamed the gallery J. Harken & Associates. In 1980, Harken moved the gallery from its downtown location to his residence. Schedules C attached to petitioners' Federal income tax returns for the years 1977 through 1982 show the following with respect to the gross receipts, cost of goods sold, gross profits, and net profit or loss from petitioners' gallery operations: *164 Net Profit
Year
Gross Receipts
Cost of Goods Sold
Gross Profits
(or Loss)
1977
$ 1,764.00
$ 1,059.00
$ 705.00
($ 8,959.00)
1978
$54,027.12
$32,448.80
$21,578.32
($16,786.04)
1979
$42,410.72
$34,252.32
$ 8,158.40
($25,961.71)
1980
$42,791.28
$27,714.58
$15,076.70
($14,193.16)
1981
$31,121.50
$ 5,361.86
$25,759.64
$ 4,747.80 1982
$36,022.00
$10,875.00
$25,147.00
$ 3,684.00 One of the artists whose work Harken exhibited at the gallery was Robert McKinney (McKinney), described by Harken as: * * * a man who has many facets. He is an artist, he is an ordained Baptist minister, he is a lecturer, he is a writer, he is a fine cook. * * * Harken first met McKinney in 1976 at an art show in Ellensburg, Washington. They became good friends. McKinney became a patient of Harken's in 1977, and Harken displayed McKinney's work in the gallery. In April 1978, Harken put on a two-man exhibit at the gallery entitled "New Art Spirit" featuring the work of artists McKinney and John Jones (Jones). The exhibit program lists for sale 25 McKinney paintings each identified by title, size, and selling price. Listed prices ranged *165 from $150 to $7,000. One of the paintings, Mayan Dancers, listed on the program by size at 40" X 48" and at a sale price of $6,000, was purchased on May 2, 1978, by Reta Gilbert for $4,500. The usual practice, with respect to paintings such as this one, held by the gallery on consignment and sold through the gallery, was for the gallery to pay 60 percent of the sale price to the artist and to retain the remaining 40 percent. In May 1979, Harken's gallery again featured a two-man exhibit showing the works of McKinney and Jones. The exhibit program lists 25 McKinney paintings for sale at prices ranged from $300 to $15,000. There is no evidence in the record concerning any sales of McKinney's work from that exhibit. 2. Petitioners' Art Acquisitions and Contributions
A. 1977 Acquisitions and 1978 Contributions
During 1977, petitioners acquired the following pieces for their personal art collection: 1. On April 16, 1977, Harken purchased from Myers at Treasure Trails Supply a 15" X 29" original pen and ink monochrome drawing on silk depicting a log cabin with horses by artist Ace Powell (Powell). The original selling price of the piece was approximately $900 *166 or $950; Harken purchased it from Myers for $788.25. 2. On October 12, 1977, petitioners purchased from McKinney two oil paintings and the copyrights to both: [3] The Price of Power, 36" X 48", depicting Mayan warriors in battle with a jaguar, for $4,000; and Jungle Fever, 30" X 40", depicting two jaguars in the jungle, for $3,000. [4]
On November 13, 1978, petitioners contributed the Powell drawing and the two McKinney paintings, plus copyrights, described above to the Museum of Native American Cultures (MONAC) in Spokane, Washington, which is operated by the Pacific Northwest Indian Center, Inc. (PNIC). [5] The parties have stipulated that MONAC is an organization qualified under section 501(c)(3) to receive *167 contributions deductible under section 170(c). [6]
Petitioners did not have any of the works appraised before they contributed them to MONAC. Shortly after the contributions, MONAC provided petitioners with four written appraisals valuing the contributed works.Petitioners attached copies of the appraisals to their 1978 Federal income tax return. Each of the four appraisers [7] assigned a fair market value to each of the pieces without any explanations to how such values were determined. The appraisals were as *168 follows: Appraised Values
Item
P. C. Bates
P. Masa
W. J. Crawford
J. S. Barratt
Average
Powell drawing
$ 5,000.00
$4,000.00
$4,500.00
$4,000.00
$4,375.00
on silk
The Price of
Power
$ 9,500.00
$9,500.00
$9,750.00
$6,500.00
$8,812.50
Jungle
Fever
$10,500.00
$8,500.00
$8,650.00
$6,500.00
$8,537.50
The receipt provided to petitioners by MONAC, signed by Wilfred P. Schoenberg (Schoenberg) and Charis S. Howser, president and secretary of PNIC, respectively, also attached to petitioners' 1978 return, states as follows: Note items #'s 7 and 8 [the McKinney paintings], the average appraisal for these items is $8,675.00. In our opinion a like value of $8,675.00 should be assigned to the copyrights of these pieces, since these copyrights were explicitly acquired from the artist for limited reproduction. Petitioners claimed charitable deductions for 1978 for the contested items based on a total value of $39,075. They arrived at this figure by taking the average of the four appraisals received from MONAC for the Powell drawing and *169 the McKinney paintings and adding the copyright values for the paintings assigned in the receipt signed by Schoenberg. The following reflects the values used by petitioners for purposes of their 1978 charitable contribution deduction: Contributed Item
Value Used on Return
1. Powell drawing
$ 4,375.00
on silk
2. The Price of Power
8,812.50
Copyright
8,675.00
3. Jungle Fever
8,537.50
Copyright
8,675.00
$39,075.00
B. 1978 Acquisitions and 1979 Contributions
On December 29, 1978, Harken purchased from Mr. and Mrs. Don Brewer (hereinafter the Brewers) four sketchbooks containing a total of 66 sheets, all drawn by Powell during 1949-1950 while he was an art student at the University of Montana, and four wood-carvings also done by Powell. Harken paid the Brewers a total price of $2,000 for the sketchbooks and wood carvings. This purchase was recommended to Harken by Myers, manager of Harken's gallery, who told Harken they were a good value. On December 30, 1979, petitioners contributed the four Powell sketchbooks to MONAC. Soon after the contribution, petitioners received three appraisals from MONAC concerning the fair market value of the *170 sketches, which petitioners attached to their 1979 Federal income tax return. Each appraiser assigned a fair market value to each of the individual sketches without any further explanation as to how the values were arrived at. Petitioners took the average of the appraisals for each individual sketch which they had received from MONAC. The appraisals for the individual sketches ranged from a low of $42 to a high of $1,200. Petitioners claimed a charitable contribution deduction for 1979 based on a total value for the contributed sketchbooks of $31,740. 3. Petitioners' Expert Appraisal
Petitioners obtained an appraisal of the fair market value of the contested items from Paul M. Raczka (Raczka), a Spokane art broker of some 15 years experience who specializes in American Indian, Eskimo, and Western art. The following is a summary of his valuations. A. Powell Drawing and Sketchbooks
Raczka appraised the Powell drawing on silk in his report dated November 12, 1982, and the Powell sketchbooks in his report dated November 15, 1982. In both reports, Raczka provides the same description of Powell's career which spanned the years from 1938 until his death in 1978. *171 Raczka states that Powell is "considered to be the 'Dean' of western art in the northwest." Attached to both reports are copies of the Congressional Record of October 6, 1967, containing a biography of Powell and a statement by Montana Senator Mike Mansfield in which he describes Powell as "an artist who is a worthy successor to the great Charles Marion Russell, who * * * is the outstanding western artist in the history of the Republic." Raczka further notes that three biographies of Powell's life have been published as well as three books of his etchings and numerous articles on his life and art. With regard to the Powell drawing on silk, Raczka regards this as a "one-of-a-kind" piece in that it is the only work of Powell's done on a silk medium. He considers the drawing as artistically "one of Powell's strongest pieces". The starting point for Raczka's valuation of the Powell drawing on silk was based on the "French Point System" which, according to Raczka, is employed by major galleries in the United States and Europe. Under this valuation technique, a value per square inch for an artists' work is determined through sales of other pieces by the artist. Raczka's report states, *172 without identifying the source of his information, that Powell oil paintings sold in 1978 were sold for $11.57 per square inch. In addition to the value reached using the French Point System technique, Raczka considered in his valuation the selling prices of between $1,500 to $2,000 for pen and ink drawings done by Powell's son, David. According to Raczka, Powell and his son paint in a similar style with similar technique but Powell's work should command a higher price because his reputation was more advanced than that of his son. Powell's death on January 25, 1978, before petitioners' contribution of the drawing, also had a positive impact on the price of his work. In Raczka's opinion, the fair market value of Powell's drawing on silk, contributed by petitioners to MONAC in 1978, was $4,380. As for the Powell sketchbooks, Raczka was of the opinion that their greatest value lies in the art history area inasmuch as the sketches would provide to an art historian the "key" to Powell's development, technique, competence, compositional skill, influences, and future areas of strength and interest. Raczka termed the collection a "scholastic treasure." It was his opinion that the *173 sketchbooks would most likely be sold as a collection. In valuing the Powell sketchbooks, Raczka assigned a "base value" to each individual sketch, ranging from a low of $250 to a high of $850, representing the artistic merit and salability of each as an individual piece. He then added an additional 33 percent to the total value to reflect the value of the sketches if sold as a total collection. Raczka's appraisal of the fair market value of the Powell sketchbooks, contributed by petitioners to MONAC in 1979, was $35,876.75. B. McKinney Paintings
According to Raczka, McKinney's work has become known in such various areas as New York City, Texas, Nevada, Montana, Wyoming, California, and Washington. McKinney's work appears in important private and public collections, such as the Alamo in San Antonio, Texas. His work has been exhibited in one-man shows at such places as the National Museum of Fine Arts, Belize City, British Hondouras; NASA Center, Houston, Texas; and York County Nature Museum, Park Hill, South Carolina. Attached to Raczka's report is McKinney's resume in which he describes himself as: "Professional Painter; Sculptor; Writer; Teacher, Ordained Minister; *174 Hunter of the Jaguar," and in which he lists his one-man art shows from 1949--1978. Also attached are copies of articles from such newspapers as The Houston Post and The Charlotte Observer, among others, describing McKinney's life and work as a minister, teacher, hunter, and artist. Raczka valued both McKinney paintings using the French Point System at a value of $4.80 per square inch based on sales figures which were provided to him by McKinney. [8] Raczka does not, however, identify the sales upon which the square inch value was based. Using the French Point System, Raczka determined that the fair market value of the McKinney paintings, donated by petitioners to MONAC in 1978, was as follows: The Price of Power, $8,294.40, and Jungle Fever, $5,760. *175 With respect to the value of the copyrights, Raczka used general financial information for the commercial printing-lithography industry compiled in a reference work, "Annual Statement Studies", by Robert Morris Associates. For purposes of his valuation of the copyrights, Raczka assumed that the copyrights would be used to their "utmost advantage." Based on the size of several limited edition McKinney prints in production, Raczka assumed production of 3,000 units at a retail selling price of $200 each. [9] The wholesale price would be 50 percent of retail, $300,000, and the cost of goods sold would be $8 per unit or $24,000, leaving a net profit before taxes of $276,000. Raczka determined that the artist's (copyright) share would be 5 percent of net profit before taxes or $13,800. Thus, the fair market value of the copyrights for both paintings was determined by Raczka to be $13,800. *176 4. Respondent's Expert Witnesses
Respondent obtained the opinions of two experts concerning the fair market values of the art pieces at issue. F. Herbert Hoover (Hoover), a San Francisco gallery owner who deals in Western art and has been in the gallery business for 20 years, appraised all of the contested items. Lynn McAllister (McAllister), of Seattle, who has a Ph.D. in art history from Cornell University, and who operates a gallery in Seattle, and has served as an art appraiser and art broker since 1978, appraised only the McKinney paintings and copyrights. The following is a summary of their opinions concerning their respective opinions as to the fair market values of the contested items. A. Powell Drawing and Sketchbooks
Hoover physically examined the pieces he was assigned to appraise and considered the quality and artistic merit of the work. After physical inspection, he researched the artists by checking auction records for comparable sales, and standard art reference books for any information on the artist; and by talking to others in the art gallery business to try to determine what prices the pieces would bring in the marketplace. Hoover could *177 find no auction records of sales of comparable works by Powell. Further, although Powell's name appears in "The Illustrated Biographical Encyclopedia of Artists of the American West", it states that, as of 1976, its publication date, Powell has "no current auction record." Hoover did find that in a bulletin dated March 16, 1980, published by Harold G. Davison of Santa Barbara, California, two numbered and signed Powell etchings were listed for sale at $60 and $125, respectively, and a Powell oil painting was offered for sale at $750. Hoover describes Powell in his report as a "comparatively well-known, though largely self-taught artist, familiar to a number of galleries in the Western United States * * * relatively unknown on the east coast." Hoover describes Powell's work as "often uneven in quality" and he notes that most galleries are not too interested in handling his work, except for a few major oils and watercolors. Hoover states that a gallery such as the Hunter Gallery in San Francisco, one of the biggest dealers in Western paintings, will not handle Powell's work. As for the pieces themselves, Hoover describes the Powell drawing in his report as a "very slight work, *178 of interest primarily for the unusual base employed, and limited in its visual effect." In Hoover's opinion, the image on the drawing is "very, very weak" and "just really not one of his better efforts." According to Hoover, the fair market value of the Powell drawing on silk was $600. In Hoover's opinion, the collection of sketches in the Powell sketchbook "varies considerably in quality and importance." In Hoover's view, the sketches "represent the ideas jotted down during a brief period of the artist's life" and that "[i]n essence they amount to mere doodles." In general, he found the condition of the sketches to be only fair, and they were maintained by MONAC in a very disorganized fashion in a file drawer in the museum basement. In Hoover's opinion, the Powell sketches contributed by petitioners were not of as good quality as those advertised by Davison in his bulletin. Hoover valued each sketch separately, from a low value of $45 to a high value of $450. In his opinion the total fair market value of the collection was $12,795. B. The McKinney Paintings
(1) Hoover's Valuation. Hoover was unable to find any information on McKinney, or to get in touch with *179 him, terming his efforts to do so "like looking for a needle in a haystack." Hoover inquired about McKinney at MONAC, but no one at MONAC would give him any information. Hoover's research turned up no record of McKinney in a standard compilation of auction records, nor any records of actual private sales either by galleries or collectors. Hoover contacted Butterfield's and Sotheby Parke-Bernet, major auction houses in San Francisco; neither had any record of McKinney. McKinney is not listed in such standard reference works as "The Illustrated Biographical Encyclopedia of Artists of the American West", "Who's Who in American Art" (1972--1980), or the "Dictionary of Contemporary American Artists." Hoover was also unable to find any reviews of McKinney's work by any recognized art critic. Hoover's contacts with various galleries such as the Hunter Gallery in San Francisco, which specializes in Western and contemporary art, the Maxwell Galleries, which cover a broad range of American and European art, and the Biltmore Gallery in Los Angeles were equally fruitless. The Curtis Gallery in Spokane similarly had no record of McKinney. Having failed in his attempts to find information *180 on McKinney, Hoover based his valuation of the McKinney paintings on his own judgment and the judgment of some of his peers in the art business. Hoover's own opinion was that the two McKinney paintings were "very badly done" and "just rank amateur work." In his report, Hoover states: It is my considered opinion that these two paintings are of mediocre quality, comparable to the type of work shown in hotel lobbies and at airports, and of little or no resale value, or potentially substantial increase in value. * * * Relying on his judgment, Hoover concluded that the value of each of the two paintings was $750. With respect to the value of the copyrights, Hoover states that he could find no record of any McKinney reproductions. He checked with Martin Lawrence Limited Editions which publishes a flyer on artists who do lithographs in limited editions, but could find no information on McKinney. Because he could find no evidence of McKinney reproductions in existence, Hoover concluded that a copyright value "based on hypothetical future reproductions," would be "minimal and speculative." (2) McAllister's Valuation. In general, when valuing a piece of art, McAllister first *181 tries to find a price structure for the particular artist by consulting auction catalogs. She also endeavors to find out about the artist's reputation by contacting galleries and museums. McAllister found no information on McKinney whatsoever from any sources. She checked four major auction catalogs: "Mayers International Auction Records", "Annual Art Sales Index", "Leonard's Annual Art Sales Index", and "Art Quest" (a London, England, data base with over 500,000 artists listed). None had information on any sales of McKinney's work. McAllister checked five major biographical art reference works: "Artists of the American West", "Contemporary Painters of the American Art", "Who's Who in American Art" (1978-1984), "Annual Art Guide to Museums and Galleries", and the "Smithsonian Institutes Art Card File Index on Living American Artists." None of these sources produced any information on McKinney. McAllister also contacted unsuccessfully numerous galleries and museums in the Western United States for any sales information or biographical notes on McKinney. Having failed in her efforts to locate information through galleries or museums, McAllister attempted to trace McKinney through *182 the biographical information concerning McKinney contained in the MONAC catalog. One of the sources listed was the Alamo Historical Society. McAllister found, however, that the Alamo Historical Society does not exist. She contacted the Alamo Historical Library, the San Antonio Historical Society, and the San Antonio Museum of Art, none of which had any information on McKinney. Her attempts to reach McKinney in Alvin, Texas, where MONAC said he was living, also proved fruitless. Because she was not able to find any information on McKinney, his reputation, or comparable sales of his work, McAllister based her appraisal on comparison of sale prices obtained by artists who are working with a similar subject matter, medium, size, condition, and quality. McAllister valued The Price of Power at $600, calling it a "poor quality painting." As for Jungle Fever, McAllister determined its value at $800. Again, McAllister presents a detailed critical analysis of the artistic merit of the piece. She notes that while it is not as inaccurate nor as disappointing as The Price of Power, it is still only an "adequate" painting. According to McAllister, loss would be incurred if prints were *183 produced of either painting. This indicates that the copyrights have no value. McAllister based her analysis of the copyright values on her own experience in selling prints and on information received from a printmaker who operates a gallery around the corner from her own gallery in Seattle. In McAllister's view, a copyright has no value unless an artist can actually market and sell the work. Further, the success of a print depends in large part on the reputation of the artist as a printmaker. A reputation is built only after a body of work has been produced by an artist. "One print does not build a reputation nor does it make a printmaker." McAllister was unable to find any prints by McKinney. After her search at museums and galleries, McAllister concluded that there is no market for McKinney's work. 5. Positions of the Parties
The following table summarizes the acquisition dates and costs, the contribution dates and the positions of the parties concerning the fair market values of the contested items as of the contribution dates: Fair Market Value on
Contribution Date
Acqui-
Contri-
Peti-
Respond-
sition
bution
tioners'
ent's
Year
Item
Date
Cost
Date
Position
Position
1978
Powell drawing
4/16/77
$ 788
11/13/78
$ 4,380
$ 600
on silk
The Price of
10/12/77
$4,000
11/13/78
$ 8,294
$ 750
Power
Copyright
$13,800
Jungle
10/12/77
$3,000
11/13/78
$ 5,760
$ 750
Fever
Copyright
$13,800
1979
Powell
12/29/78
[1] $1,600
12/30/79
$35,877
$12,795
sketchbooks
*184 ULTIMATE FINDINGS OF FACT 1. The fair market values of the items contributed by petitioners to MONAC on November 13, 1978, were, as of that date, as follows: Item
Fair Market Value
Powell drawing on silk
$1,000
The Price of Power
$4,000
Copyright
Jungle Fever
$3,000
Copyright
2. The fair market value of the Powell sketchbooks contributed by petitioners to MONAC on December 30, 1979, was, as of that date, $12,795. OPINION The amount allowable as a deduction under section 170(a) for a charitable contribution of property other than money is the fair market value of the property as of the date of the gift. Sec. 1.170A-1(c)(1), Income Tax Regs. The sole issue for determination is the fair market value of the items contributed by petitioners to MONAC in 1978 and 1979. *185 Fair market value is defined by the well-known formula as that price at which the subject property would change hands between a willing buyer and a willing seller, neither having any compulsion to buy or sell and both having reasonable knowledge of relevant facts. Sec. 1.170A-1(c)(2), Income Tax Regs.The valuation process has been consistently recognized as inherently imprecise. Estate of Smith v. Commissioner,57 T.C. 650, 655 (1972), affd. 510 F.2d 479 (2d Cir. 1975). The issue is one of fact to be resolved in light of all the evidence of record, including the expert testimony on which both parties have relied in advocating their widely divergent positions. McGuire v. Commissioner,44 T.C. 801, 806 (1965); Kaplan v. Commissioner,43 T.C. 663, 666 (1965). In reaching our ultimate findings set forth above, we have carefully considered all of the evidence. We shall discuss our conclusions with respect to each of the contested items in turn. 1. Powell Drawing on Silk
Petitioners contend, based on Raczka's report, that the value *186 of the Powell drawing increased by over 500 percent from the time Harken purchased it in 1977 to the time he contributed it to MONAC in 1978, a year and a half later. Respondent contends, based on Hoover's appraisal, that the drawing was worth less when petitioners contributed it to MONAC than when Harken purchased it. For the reasons stated below, we find neither of the expert opinions controlling as to the Powell drawing. Raczka bases his appraisal to a great extent on the French Point System under which he assigned a value of $11.57 per square inch based, according to his report, on sales of Powell's work in 1978. Raczka, however, does not indicate from whom or how he obtained the sales information; he does not identify the number of such sales on which the figure is based; nor does he give any details as to whom such sales were made. Without such essential information, we find his square inch figure unsubstantiated and unreliable. Further, we accept Hoover's testimony that the French Point System is not a widely used valuation technique, and is used only for "celebrated artists, artists who are well known." [10] Thus, we are not persuaded by Raczka's opinion concerning the *187 value of the drawing. We also think, however, that Hoover's valuation, while more realistic than Raczka's, is somewhat low. Hoover himself cited at trial a sale price of a Powell oil painting at $750. Further Hoover does not give as much weight as we think he should have to the fact that this drawing on silk is a one-of-a-kind work by Powell. Harken paid $788 for the drawing in 1977 which, at that time was offered for sale for between $900 and $950. In addition, between the time Harken purchased the drawing and the time he contributed it to MONAC, Powell died. Both Raczka and Hoover agreed that after Powell's death, prices for his work rose. We conclude, therefore, that the fair market value *188 of the Powell drawing as of November 13, 1978, was $1,000. 2. McKinney Paintings and Copyrights
Because there is no evidence on sales of McKinney's works, we find Raczka's valuation based on the French Point System technique unconvincing. Indeed, as is evident from the expert reports, McKinney is not even as well known an artist as Powell. Thus, we do not think the French Point System is an appropriate method of valuing McKinney's work; it produces, in our opinion, an excessive valuation for the work of such a little known artist. We also think, however, that the values determined by both of respondent's experts, Hoover and McAllister, are too low. While we do not fault the exhaustive research done by both experts which failed to produce any information on McKinney, we do believe that there are certain factors which, when taken into consideration, would suggest a higher value for the paintings. Both Hoover and McAllister performed their appraisals several years after the 1978 contribution date. Neither of them was particularly knowledgeable about the local Spokane art market. They were both unaware of the exhibits of McKinney's work held by Harken at his gallery in *189 1978 and 1979 where McKinney's paintings were being offered for sale at prices comparable to the prices at which Harken purchased the paintings at issue. Because of their inability to locate information on McKinney, they were forced to rely--too heavily, we think--on their own subjective reactions to the work. There is evidence in the record that, in our view, supports a higher valuation. First, petitioners actually paid $4,000 for The Price of Power and $3,000 for Jungle Fever in 1977, a year before the contribution. It is well established that cost is cogent evidence of fair market value. Guggenheim v. Rasquin,312 U.S. 254, 258 (1941); Tripp v. Commissioner,337 F.2d 432, 434 (7th Cir. 1964), affg. a Memorandum Opinion of this Court. [11] In addition, the only evidence in the record concerning an actual sale of a McKinney painting is the sale of Mayan Dancers to Reta Gilbert on May 2, 1978, for $4,500. This painting appears to be similar in size and technique to the paintings here at issue. Based on these facts, we conclude that the fair market value *190 of the two McKinney paintings contributed by petitioners to MONAC in 1978 was as follows: The Price of Power--$4,000; and Jungle Fever--$3,000. As for the copyrights to the paintings, we accept the opinion of McAllister, respondent's expert, that they have no value. Although petitioners produced at trial three prints depicting work by McKinney, apparently from an edition of 3,000, and the covers of the Alvin, Texas, telephone book and Vol. 45 Texas Bar Journal, No. 3 (Mar. 1982), which also contain reproductions of McKinney's work, we do not think that the mere existence of those prints alone is sufficient to establish that there exists a profitable market for McKinney's work. Petitioners offered no evidence showing how many prints of McKinney's work have ever been sold. We were impressed by McAllister's well-reasoned analysis of the potential profits to be made from reproductions of McKinney's work. As she pointed out, a copyright has no value unless the artist can actually market and sell the work, and the success of the print depends in *191 large part on the reputation of the artist. Petitioners simply have not shown that McKinney has the reputation or the ability to market prints and make a profit from it. We conclude, therefore, that the copyrights have no value. 3. Powell Sketchbooks
After careful consideration of the reports of both Raczka and Hoover, we accept as more reasonable Hoover's valuation of $12,795 for the Powell sketchbooks contributed by petitioners to MONAC in 1979. Raczka, petitioners' expert, merely assigned values to each of the sketches without any explanation of his reasons and without citing any prices of comparable works by Powell. Given the poor condition of many of the prints, we think the values he assigned are, in general, too high. We find it difficult to understand why MONAC, possessed of a collection purportedly worth over $35,000, according to Raczka, would store the prints in the basement in such a neglected condition. We think Hoover's appraisal of the sketches is more in line with the quoted prices for Powell etchings which he cites in his report. Indeed, Hoover's appraisal reflects appreciation of some 800 percent from petitioners' original acquisition cost. Thus, *192 we think Hoover's appraised value more than sufficiently reflects the value of the sketches individually and as a whole. 4. Summary
Petitioners urge us to accept their contention that, because they were knowledgeable and shrewd art collectors, it was possible for them to have purchased the pieces at issue at bargain prices, and in selecting items for contribution to MONAC, they chose those pieces which had appreciated most in value. While we do not disagree that art dealers often are able to acquire real "finds" at bargain prices, the evidence contained in the record does not convince us that petitioners were particularly shrewd in their art acquisitions. The financial information concerning petitioners' art gallery operations, summarized in our findings, in no way reflects rates of appreciation for pieces sold in the gallery comparable to the claimed values of the pieces contributed by petitioners to MONAC. Based on the evidence as a whole, we think the works of Powell, a more well known artist, did appreciate in value. The appreciation is reflected in our ultimate findings. As for the works of McKinney, a virtually unknown artist, we are unable to conclude that the *193 value of the works appreciated at all above the purchase price paid by petitioners. The record simply does not support the rate of appreciation claimed by petitioners. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted. ↩
2. The deficiency determined by respondent for 1980 is the result of carryovers of charitable contributions from previous years.Thus, our determination with respect to the fair market values of the items contributed in 1978 and 1979 will be determinative of the deficiency for 1980 as well.↩
3. We accept Harken's testimony that he and his wife purchased the two paintings and acquired the copyrights to them on the same date, Oct. 12, 1977. ↩
4. Throughout the record, these paintings are referred to by various names other than those given above. For the sake of clarity, we have referred to them throughout the opinion as The Price of Power, depicting a scene in which Mayan warriors are hunting a jaguar and Jungle Fever depicting two jaguars in a jungle setting.↩
5. On brief, respondent contends that petitioners failed to make a valid copyright transfer to MONAC in writing as required by 17 U.S.C. sec. 204↩. We do not consider this issue inasmuch as it was raised by respondent for the first time on brief. 6. Petitioners also contributed to MONAC five bronzes by artist E. W. Deming on the same date. The parties have stipulated that the total fair market value of the Deming bronzes as of the applicable contribution date was $1,600. The values contested by the parties for 1978, and the ones to which we limit our discussion, are those for the Powell drawing and the two McKinney paintings plus copyrights.↩
7. None of the individuals who made those "appraisals" testified as a witness at the trial.↩
8. In his original report dated Nov. 12, 1982, Raczka used a square inch value of $6.75, arriving at values for the two paintings of $11,000 (The Price of Power) and $8,100 (Jungle Fever). In his revised valuation dated Sept. 7, 1984, Raczka reduced the square inch value to $4.80 after having discovered that one of the sales, unidentified by him, on which the original square inch value was based, was made to a student and close friend of McKinney's and thus was not considered to be an arm's-length transaction.↩
9. At trial, counsel for petitioners showed one of respondent's experts, Dr. Lynn McAllister, three prints allegedly of McKinney's work. A print entitled Don't Surrender, Boys, depicting an Alamo battle scene, is numbered 22/3,000. Similarly, a print entitled Deguello is also numbered 22/3,000 and is dated 1981. The third is entitled Savage Sunday. Don't Surrender, Boys appeared on the cover of Vol. 45 Texas Bar Journal, No. 3 (Mar. 1982). Petitioners produced no evidence concerning any sales of McKinney prints.↩
1. As noted above, Harken paid a total of $2,000 to the Brewers for both the sketchbooks and some woodcarvings by Powell. Harken stated that he arbitrarily assigned an acquisition value of $1,600 to the sketchbooks and $400 to the carvings.↩
10. See Cukor v. Commissioner,T.C. Memo. 1968-17, in which the Court, rejecting a square inch approach to the valuation of a painting by artist Georges Braque, stated: One [expert witness] used a "square inch" method of valuing the painting--a method that does not appear to be commonly accepted as a basis for determining fair market value of paintings generally * * *.↩
11. Wiltshire v. Commissioner,T.C. Memo. 1980-210; Rupke v. Commissioner,T.C. Memo. 1973-234↩.